UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| PAIGE HERIGES,           ) | |
|                          ) | |
|     Plaintiff,      ) | Case No. 3:09-0362 |
|                          ) | Judge Trauger |
| v.                       ) | |
|                          ) | |
| WILSON COUNTY, TENNESSEE, and  ) | |
| BILL ARNOLD, officially and individually, ) | |
|                          ) | |
|     Defendants.    ) | |

## MEMORANDUM

Pending before the court is the defendants' Motion for Summary Judgment (Docket No. 15) and the plaintiff's Motion for Summary Judgment (Docket No. 22.) For the reasons discussed herein, the defendants' motion will be granted in part and denied in part and the plaintiff's motion will be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of the termination of plaintiff Paige Heriges from her position as an Animal Control Officer for Wilson County on April 22, 2008.[1] Defendant Bill Arnold has

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 17, 23, and 30) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F. 3d 797, 800 (6th Cir. 2000).

1

served as the Wilson County Animal Control Director since January 2003. Arnold hired the plaintiff as an Animal Control Officer in July 2004. Before going to work for Wilson County, the plaintiff had worked as a veterinary technician and as the Animal Control Officer for the City of Mount Juliet.

The Wilson County Animal Control Department (WCACD) offers limited services. While the WCACD's mission statement provides that the mission of the WCACD is to uphold all provisions of the Tennessee Code related to animals, WCACD officers primarily respond to citizen complaints of dogs running at large in violation of the Tennessee leash law. Dogs captured by WCACD that are not quickly claimed by their owners are euthanized by a contract veterinarian.

In April 2007, Arnold promoted the plaintiff to the position of Animal Control Supervisor because Arnold believed that the plaintiff could handle additional responsibilities. The plaintiff was never given a new written job description but understood that she would be responsible for the day-to-day operations of the Department and for the supervision of its employees. Until the fall of 2007, Arnold felt that the plaintiff was performing her job competently.

In late 2007, for reasons that are disputed, the plaintiff's working relationship with Arnold began to deteriorate. Arnold claims that the plaintiff's attitude became negative, argumentative, and hostile after he denied her request for a vacation the week of October 8-12, 2007. The plaintiff claims that the deterioration of the relationship began shortly after she began discussing alleged violations of policy and state law occurring within the WCACD.

2

Specifically, the plaintiff believed that the WCACD did not comply with state laws regarding vaccinating dogs for rabies or the spaying/neutering of dogs. The plaintiff was also concerned that Dr. Clariday, the veterinarian responsible for euthanizing animals, was not doing so properly. The plaintiff believed that the Department should offer more services, and she discussed all of these concerns on repeated occasions with her colleague Paula Heird, her family, close friends, her boyfriend, her boyfriend's family, and Wilson County Commissioner Heather Scott, among others.

A key issue in this dispute is whether Arnold was aware that the plaintiff began vocalizing her opposition to certain WCACD policies. It is clear that, in early 2008, the plaintiff, Arnold, and Commissioner Scott had a discussion about the WCACD's vaccination practices. Also, on February 1 or 2, 2008, Arnold and the plaintiff had one discussion about the WCACD's alleged failure to properly vaccinate a dog for rabies. However, the plaintiff never had a discussion with Arnold about the spay/neuter law or her concerns about Dr. Clariday.

Around the same time, Arnold told the plaintiff that the Wilson County Commission was forming an Animal Control Special Study Committee to investigate concerns about the WCACD. The committee met in December 2007 and January 2008, although the plaintiff did not attend these meetings. The plaintiff did attend the February 11 meeting at the invitation of Commissioner Scott, who apparently believed that the plaintiff's presence could be "beneficial" to the goals of the committee, which included investigation of "dog bites and rabies issues." (Docket No. 16, Ex. 1, at 211-13.)

3

The parties dispute whether anyone at this February 11 meeting said anything critical of Arnold. The defendants point to the plaintiff's deposition, in which she testified that "nothing critical" of Arnold was said at the meeting. (*Id*. at 220-26.) The plaintiff argues that, though nothing explicitly critical of Arnold was said, the meeting was "pretty much anti-Bill Arnold," which was consistent with "the tenor of all of the meetings." (Docket No. 25, Ex. 7, at 24, 71.) Special Study Committee member Kenneth Reich testified at his deposition that the committee was concerned with Arnold's leadership, and some such concerns were expressed at the meeting. (*Id*. at 24-27.) Indeed, the day after the February 11 meeting, Reich, at the suggestion of the committee, called Arnold and asked him if he would be willing to give up his position at Animal Control. (*Id*. at 21-23.) From various sources, Arnold became aware that the plaintiff had participated in the February 11 meeting.

From mid-February 2008 onwards, the plaintiff's working relationship with Arnold rapidly deteriorated. On February 15, 2008, Arnold, via hand-delivered letter, notified the plaintiff that Wilson County had been asked to pay for damages relating to an on-the-job accident in which the plaintiff had been involved earlier that year. The plaintiff contends that Arnold, in advising her of this, struck her on the shoulder with the letter and then, apparently shifting his focus to the Special Study Committee meeting, stated, "I don't know who you're getting your information from, but you might better call them back. Apparently there was a whole h--- of a lot that went on at that meeting Monday night." (Docket No. 25, Ex. 1 at 228-30.) Arnold denies that this interaction took place.

4

Shortly thereafter, the plaintiff told Arnold that she planned to attend the March 3 meeting of the Special Study Committee. Arnold never asked the plaintiff not to attend the meeting. In her deposition, the plaintiff testified that, at the meeting, she mentioned, off the record, to committee members that Arnold was not happy that she was attending the meeting, and she and the committee members discussed improvements at WCACD that needed to be made regarding the rabies vaccinations and spay requirements. The plaintiff alleges that Arnold learned of these discussions of the March 3 meeting from Dr. Clariday's son, who was in attendance. Arnold claims that he only learned that the plaintiff had attended the meeting but that he did not learn of the substance of the conversations.

After the March 3 meeting, Arnold placed several disciplinary notes in the plaintiff's file. On March 7, 2008, Arnold noted that the plaintiff, in essence, had failed to maintain a proper level of dog food at WCACD. On March 28, 2008, Arnold reminded the plaintiff in writing that dispatch logs needed to be completed and noted that this was his third such request that month. He also reprimanded the plaintiff for "inappropriate attitude towards management." (Docket No. 16, Ex. 2 at 18-19, 27.) On April 9, 2008, Arnold wrote the plaintiff a note expressing his concern about dogs receiving fresh water and sufficient exercise. He also asked her to review the WCACD feeding policy. On April 11, 2008, Arnold gave the plaintiff a second written warning about her hostile attitude because, on that day, the plaintiff complained about lunchtime staffing.

On April 11, 2008, the plaintiff gave Arnold, in response to the letter he gave her on April 9, 2008, a 1½ page note stating her concerns about the way that the office was

5

administered. The plaintiff also claimed that she had been subject to harassment and retaliation due to her participation in the Special Study Committee meetings.

In a meeting on April 14, 2008, the plaintiff told Arnold that, in her opinion, it was the director's responsibility (and not hers as a supervisor) to plan, schedule, coordinate, and direct Animal Control personnel. Following that meeting, Arnold informed the plaintiff that, under the plaintiff's view, there was not anything substantive for a supervisor to do and, therefore, he was eliminating the Animal Control Supervisor position and demoting the plaintiff to Animal Control Officer. Shortly thereafter, in response to a questionnaire that Arnold gave to all employees, the plaintiff reported that she never used her seatbelt on the job. On April 21, 2008, Arnold gave the plaintiff a written reminder to wear her seatbelt in the Animal Control vehicle as required by law. On April 22, 2008, Arnold terminated the plaintiff's employment because he no longer felt that the plaintiff could be a "team player" because of her "insubordination" and "disruptive behavior." (Docket No. 18 at ¶ 9.)

On April 20, 2009, the plaintiff filed this lawsuit against Wilson County and Bill Arnold (in his individual and official capacity). The plaintiff alleges, among other things, that she was terminated in retaliation for exercising her First Amendment rights. The parties engaged in substantial discovery, and the defendants filed a Motion for Summary Judgment on April 16, 2010. The plaintiff filed a Counter-Motion for Summary Judgment on May 17, 2010.

6

## ANALYSIS

The plaintiff claims that she was terminated due to her constitutionally protected speech in violation of 42 U.S.C. § 1983. The plaintiff also asserts state law claims against the defendants under the Tennessee Public Employee Political Freedom Act (PEPFA) and the Tennessee Public Protection Act (TPPA).

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving party shows that there is no genuine issue of material fact as to at least one essential element of the non-moving party's claim, the burden shifts to the non-moving party to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the [non-moving party's] proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252.

An issue of fact is "genuine" only if a reasonable jury could find for the [non-moving party]. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II. Constitutional Claims

### A. The Section 1983 claim against Arnold[2]

Defendant Arnold claims that he is entitled to qualified immunity on the plaintiff's Section 1983 claims. (Docket No. 16 at 14.) "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "In determining whether qualified immunity applies, [the court] employ[s] a two-part test, asking (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Dorsey v. Barber,* 517 F.3d 389, 394 (6th Cir. 2008). The plaintiff has the ultimate burden of proof to establish that the defendant is not entitled to qualified immunity. *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002). "Whether qualified immunity is applicable to an official's actions is a question of law." *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996).

---

[2] As discussed above, the plaintiff sued Arnold in both his individual and official capacities. An official-capacity claim against a government officer "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). As the Sixth Circuit has noted, in an official-capacity suit, the government entity is "the only true defendant[]." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003). As the claims against Arnold in his official capacity are redundant of those against Wilson County, those claims will be dismissed.

### i. Violation of a constitutional right

The plaintiff asserts that she was terminated as the result of the exercise of her First Amendment rights. "[R]etaliation by a government employer against an individual who exercises his First Amendment rights constitutes a First Amendment violation...". *Perry v. McGinnis*, 209 F.3d 597, 604 (6th Cir. 2000). To establish a First Amendment retaliation claim, the plaintiff has the burden of proof on a three-step inquiry. *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 1998).

First, the court must decide whether the relevant "speech addressed a matter of public concern." *Id.* Speech on a matter of public concern includes "informing the public that a governmental entity failed to 'discharge its governmental responsibilities' or 'bringing to light actual or potential wrongdoing or breach of public trust.'" *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 148 (1983)).

Second, the court must balance the employee's interest, as a citizen, in commenting on matters of public concern against the employer's interest in "promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). That is, the court must determine whether an employee's speech "meaningfully interfere[s] with the performance of her duties, undermine[s] a legitimate goal or mission of the employer, create[s] disharmony among co-workers, impair[s] discipline by superiors, or destroy[s] the relationship of loyalty and trust required of confidential employees." *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994)**.**

9

Third, the court must determine whether the protected speech was a "substantial or motivating factor" in the employer's decision to terminate the employee. *Perry*, 209 F.3d at 604. This determination is normally a question for the jury, unless the evidence is almost completely one-sided. *See Boger v. Wayne County*, 950 F.2d 316, 322-23 (6th Cir. 1991). This inquiry focuses on whether the employee can "point to specific, nonconclusory allegations reasonably linking her speech to employer discipline." *Bailey v. Floyd County Bd. of Educ.,* 106 F.3d 135, 144 (6th Cir. 1997))**.**

If the plaintiff meets her burden with respect to the three elements, then the burden shifts to the defendant to show that it would have carried out the adverse employment action against the plaintiff, notwithstanding the plaintiff's exercise of protected speech. *Rodgers*, 344 F.3d at 603; *see also Perry*, 209 F.3d at 604**,** n.4**.**

Here, the defendants concede the first two elements for summary judgment purposes: that is, (1) the plaintiff's speech on "alleged violations of state law and [the plaintiff's] participation in the Animal Control Special Study Committee meetings" involved matters of public concern and (2) that the "balance" favors the plaintiff's interest over her employer's "efficiency" interest.[3] (Docket No. 16 at 16.) The key issue in dispute is the basis for the plaintiff's termination.

---

[3] Since conceding that the speech at issue was of public concern in the original motion for summary judgment, the defendants have backtracked and, in later briefing, argue that, in fact, the speech at issue is the plaintiff's "complaints of retaliation made to Mr. Arnold," which is only "personnel complaints" and "internal grievances," not protected speech. (Docket No. 29 at 1-2.) Clearly, the plaintiff has alleged, and attempted to show, that she was fired due to her involvement with the Special Study Committee and her whistleblowing on issues of animal care, which, as the defendants concede, are matters of public concern. (*See* Docket No. 1 at 2-3.)

10

The defendants argue that Arnold did not have the requisite knowledge of the plaintiff's protected speech in order to retaliate against her and that the plaintiff's otherwise hostile attitude and insubordination provide sufficient, non-discriminatory grounds for her termination. (Docket No. 16 at 16-17.) The defendants point to three general points in support: (1) the plaintiff never explicitly discussed the vast majority of her numerous complaints about alleged policy violations with Arnold; (2) the minutes from the Special Study Committee meetings do not reveal any explicit criticism from the plaintiff regarding Arnold; (3) the plaintiff's negative attitude at work was well-documented by the notes in her employment file. (*Id.*) Indeed, Arnold alleges that he demoted the plaintiff because, "if she was not going to be responsible for planning, scheduling, coordinating, and directing department personnel, then the supervisor's position was not needed." (Docket No. 18 at ¶ 8.) Further, Arnold claims that he terminated the plaintiff following the "full realization" that the plaintiff was never going to be a "team player," and because, after the demotion, the plaintiff became "more . . . belligerent, rude, hateful, resent[ful] to any management." (Docket No. 25, Ex. 3 at 159-61.)

Cindy Lynch, Arnold's assistant, supports Arnold's assertions that the plaintiff was terminated because of a negative attitude at work. Lynch testified in her deposition that the plaintiff's working relationship with Arnold began to deteriorate in late 2007 and continually worsened until the plaintiff was terminated in April 2008. (Docket No. 25, Ex. 4 at 16, 26, 95.) She claimed that the WCACD was in "constant turmoil" because of the plaintiff's behavior and that the plaintiff began to neglect her duties in caring for the animals. (*Id.* at 34, 71.) In sum, Lynch stated that the plaintiff was terminated because of poor "job performance" and a "hostile attitude" and that the plaintiff's termination "had been coming for quite a while." (*Id.* at 81-82.)

11

The plaintiff counters with evidence that her protected speech was a motivating factor in her termination and that Arnold's reprimands were a pretext for retaliatory motives. (Docket No. 22 at 11, 13-14.) First, the plaintiff points out that Arnold testified at his deposition that he fired the plaintiff, in part, because she was "accus[ing] [him]" of retaliation against her for "attending those meetings" and because Arnold stated that the plaintiff was constantly complaining about his "harassing her" by "filling her files with all these little notes." (*Id*. at 12.) Second, the plaintiff also points to the temporal connections between when the plaintiff attended Special Study Committee meetings and when Arnold began issuing verbal reprimands and notes for the plaintiff's file. (*Id*.) It is also clear, as discussed above, that these Special Study Committee meetings were not particularly favorable to Arnold and that Arnold knew that the meetings were occurring and that the plaintiff was attending them.

On this record, summary judgment for either side on the issue of whether the plaintiff's constitutional rights were violated would be inappropriate. The plaintiff has brought forth considerable evidence (to be sure, most of it circumstantial) that Arnold began a campaign of retaliation against her for vocalizing her opposition to certain WCACD policies and in response to her attendance and participation at meetings designed to reform the practices at the WCACD. The defendants have put forth credible evidence that Arnold and the plaintiff had a generally difficult relationship and that the plaintiff had become insubordinate and generally difficult to work with, and, therefore, she would have been fired regardless of her participation at the committee meetings or speaking out on problems at the WCACD. Whether, in light of all this, the plaintiff's protected speech and conduct was a "substantial or motivating" factor in her termination is a question for the jury.

12

### ii. Whether this right is clearly established

As stated above, the next step in the qualified immunity analysis is whether the constitutional right at issue is clearly established. Here, the defendant does not contest that the right to speak out about alleged policy violations in a municipal office is clearly established. Indeed, the Sixth Circuit has held that "[a]ll public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern...". *Chappel v. Montgomery County Fire Protection Dist. No. 1*, 131 F.3d 564, 579-80 (6th Cir. 1997). The right at issue here is clearly established as a matter of law. Therefore, the issue for the jury at trial will be whether the exercise of the plaintiff's First Amendment rights was a sufficiently motivating factor in her termination**.**

### B. The constitutional claim against Wilson County

As noted above, the plaintiff also asserts a claim of municipal liability against Wilson County under 42 U.S.C. § 1983. To set forth a "cognizable Section 1983 claim against a municipality, a plaintiff must allege that (1) agents of the municipality, while acting under color of state law, (2) violated the plaintiff's constitutional rights, and (3) that a municipal policy or policy of inaction was the moving force behind the violation." *Memphis, Tennessee Area Local v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004).

In moving for summary judgment, the defendants claim that the plaintiff has not provided any evidence that "any policy or custom of Wilson County resulted in her termination" or that "Wilson County had a policy or custom in place that violated the First Amendment rights of employees." (Docket No. 16 at 21.) In response, the plaintiff argues that she need not point to

13

an official policy to establish municipal liability. (Docket No. 22 at 15.)  That is, "a municipality can be held liable under Section 1983 for a single decision by the municipality's policymakers," so long as the official making the decision "is the one who has the final authority to establish municipal policy with respect to the action ordered." (*Id.* quoting *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993)).  The plaintiff argues that Arnold was the plaintiff's immediate supervisor "who controlled the terms and conditions of her employment, had authority to hire, promote, demote, and discharge her, and made each of those decisions in this case." (Docket No. 22 at 16-17.)  In this circumstance, the plaintiff argues, Wilson County shares liability with Arnold, as Arnold was Wilson County's "authorized decisionmaker" as to staffing at WCACD. (*Id.* at 15-16 quoting *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1118 (6th Cir. 1994).

Generally, a "final policymaker" is an official whose decisions are (1) "final and unreviewable" and (2) not constrained "by the official policies of superior officials." *Miller v. Calhoun County*, 408 F.3d 803, 814 (6th Cir. 2005).  A district court usually refers to state law for guidance on whether an individual is a final policymaker.  *Id.*  As indicated above, in only briefing this issue in a cursory fashion, the parties have provided the court with little assistance as to whether Arnold would be considered a "final policymaker" in this context as a matter of Tennessee law.

The court's independent review of the Tennessee Code indicates that counties are given general authority to "establish and operate shelters and other animal control facilities," upon passing a resolution in "their respective legislative bodies."  T.C.A. § 5-1-120.  The deposition

14

testimony in this case indicates that, consistent with this statute, Wilson County established the WCACD, which was overseen by the Urban Types Facilities Board (UTFB), which operated as Arnold's supervisor. (Docket No. 25, Ex. 3 at 12-16.)

What remains unclear is whether, in spite of the UTFB's oversight of Arnold, Arnold remained the "final policymaker" when it came to firing employees at the WCACD. Certainly, there was ample deposition testimony indicating that a significant number of the policies and procedures of the WCACD were established by the UTFB, and therefore the UTFB has a substantial oversight role. For instance, Arnold had to request permission from the UTFB to give pay raises and promotions. (*Id*. at 35-36.)

The record is mixed as to who had the final authority to terminate WCACD employees. For instance, the record shows that, while Arnold consulted with Ms. Lynch and the county attorney about his problems with the plaintiff, the decision to terminate the plaintiff was his alone, and he did not need approval from the UTFB to terminate the plaintiff. (*Id*. at 162-163.) Also, when the plaintiff spoke with the "county mayor" following her termination, he told the plaintiff that "there wasn't anything he could do [about Arnold]." (Docket No. 25, Ex. 2 at 397.)

However, the plaintiff testified that the mayor told her that, if the plaintiff told the UTFB that she "was unfairly terminated and explained [her] situation, that they would take it under advisement and could possibly give [the plaintiff her] job back." (*Id*. at 400.) Following her termination, the plaintiff attended the UTFB's May meeting and made a presentation, but it appears that she primarily asked for Arnold to be fired, not for her job back. (*Id*. at 401.) In

15

sum, the record is simply unclear as to whether the UTFB could have overruled Arnold's termination of the plaintiff such that Arnold was not the "final policymaker" on this matter.

*Rowell* was a similar case in which the plaintiff sued a county in Tennessee alleging that she was terminated as a consequence of making protected speech. *See* 2009 U.S. Dist. LEXIS 57447, at *30-32 (W.D. Tenn. July 2, 2009). There, the county defendant also argued that the plaintiff could point to no official policy that violated the plaintiff's rights and, going beyond what the defendants have done here, argued that the individuals responsible for the plaintiff's termination were not "final policymakers" with respect to the plaintiff's employment. *Id.* at *20-21. After reviewing state law, the court concluded that "the proof suggests" that the individual who terminated the plaintiff "had the authority to fire employees as part of his administrative duties." Also, in light of the fact that "the Defendant . . . offered no evidence refuting" that the individual "had such authority," the court denied summary judgment for the defendant on the "final policymaker" issue. *Id.*

Here, the defendants have failed to counter the plaintiff's argument that Wilson County is subject to liability in this case because Arnold was a final policymaker when it came to staffing at the WCACD. As Arnold's status is unclear at this time, the jury will be able to consider whether (1) there was a constitutional violation here and, (2) even if there was, whether Wilson County is not liable because Arnold was not a final policymaker.

### III. State law claims

#### A. The PEPFA claims

As noted above, the plaintiff also asserts a state law claim under the Tennessee Public Employee Political Freedom Act (PEPFA) against Wilson County and Arnold individually. PEPFA provides that it is "unlawful for any public employer to discipline, threaten to discipline, or otherwise discriminate against an employee because such employee exercised that employee's right to communicate with an elected public official." Tenn. Code Ann. § 8-50-603(a). To establish a cause of action under PEPFA, the plaintiff must show (1) the plaintiff's status as an employee of the defendant; (2) that the plaintiff communicated with an elected official; (3) that the employer disciplined, threatened to discipline, or otherwise took an adverse action against the employee; and (4) that the communication with an elected public official was a substantial or motivating factor in the adverse action taken by the employer. *Rowell*, 2009 U.S. Dist. LEXIS 57447, at *50-51 n.20. Analysis of the fourth element of the PEPFA claim mirrors the same "substantial or motivating factor" analysis as used in a First Amendment context. *Gooch v. City of Pulaski*, 2007 Tenn. App. LEXIS 181, at *16-17 (Mar. 30, 2007).

It is well-settled that a PEPFA claim cannot be brought against an official in his individual capacity and must be brought against a public entity, regardless of the merits of the claim. *Guthoerl v. City of Mount Juliet, Tenn.*, 2006 WL 1454736, at *6 (M.D. Tenn. May 22, 2006). Therefore, the PEPFA claim against Arnold in his individual capacity will be dismissed.

As to Wilson County, because the court applies the same causation analysis as with the First Amendment retaliation claim, the same reasoning from the First Amendment retaliation claim is applicable here. As discussed above, both parties present evidence that raises a genuine issue of material fact regarding the basis for the plaintiff's termination. Therefore, this claim will proceed against Wilson County.

17

### B. The TPPA claims

As shown above, the plaintiff also asserts a state law claim under the Tennessee Public Protection Act (TPPA). The TPPA directs that "no employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann § 50-1-304(b). To establish a claim under the TPPA, the plaintiff must show: (1) the plaintiff's status as an employee of the defendant; (2) the plaintiff's refusal to participate in, or to remain silent about, illegal activities; (3) the employer's discharge of the employee; and (4) an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee. *Rowell*, 2009 U.S. Dist. LEXIS 57447, at *33-34. The fourth element under TPPA of "exclusive causal relationship" clearly imposes a heightened standard of causation. *Id*. at *46-47. Proximity in time between the protected speech and the termination is not sufficient to establish an exclusive causal relationship. *Caruso v. St. Jude Children's Research Hosp., Inc.,* 215 F. Supp. 2d 930, 937 (W.D. Tenn. 2002).

Here, the plaintiff cannot show that her protected speech was the exclusive causal grounds for her termination. It is uncontested that the plaintiff had been cited on several occasions for hostile attitude and insubordination and that only "part" of the disruptive behavior given as the basis for the plaintiff's termination is attributed by the plaintiff to allegedly retaliatory motives. (Docket No. 22 at 14.) Therefore, the plaintiff's TPPA claims against both Wilson County and Arnold in his individual capacity will be dismissed.

18

## CONCLUSION

For the reasons discussed herein, the plaintiff's Counter-Motion for Summary Judgment will be denied. The defendant's Motion for Summary Judgment will be granted in part and denied in part. That is, the plaintiff's claims against Arnold in his official capacity will be dismissed, the plaintiff's TPPA claim against both Arnold and Wilson County will be dismissed, and the plaintiff's PEPFA claim against Arnold will be dismissed.

An appropriate order will enter.

_____

ALETA A. TRAUGER

United States District Judge