**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE NASHVILLE DIVISION**

| | | |
|---|---|---|
| **PAIGE HERIGES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:09-cv-0362** |
| | ) | **Judge Trauger** |
| **WILSON COUNTY, TENNESSEE, and BILL ARNOLD,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

# MEMORANDUM

Pending before the court are the defendants' Motion for Judgment as a Matter of Law, or, in the Alternative, for a New Trial, or, in the Alternative, a Remittitur of the Jury's Verdict (Docket No. 97) to which the plaintiff has responded (Docket No. 111), and the plaintiff's Motion for Award of Attorneys' Fees (Docket No. 101), to which the defendants have responded (Docket No. 117), and the plaintiff has filed a reply in support (Docket No. 119). The parties have also filed additional briefing on whether trebling certain damages in this case is appropriate. (Docket Nos. 88, 93, and 96.) For the reasons discussed herein, the defendants' motion will be denied, the plaintiff's motion will be granted, and the court will treble the damages at issue.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

This matter was tried from August 3, 2010 to August 6, 2010, and, at the end of the trial, the jury found for the plaintiff, Paige Heriges. Ms. Heriges is a former employee of the defendants; specifically, from 2004 to 2008, Heriges was employed by the defendant Wilson

County, Tennessee, Animal Control Department (WCACD) and her supervisor (and head of WCACD) was defendant Bill Arnold.[1]

Heriges's employment with the defendants began in 2004 and was uneventful and productive for the first few years. Indeed, in April 2007, Heriges was promoted from Animal Control Officer to Animal Control Supervisor and was given a $2 per hour raise, to $15.50 per hour. Throughout this time period, Heriges enjoyed a good relationship with Arnold and her co-workers both in Animal Control and in the closely related Solid Waste Division, both of which were overseen by Arnold.

Arnold and his assistant in the Solid Waste Division, Cindy Lynch, testified that tension between Arnold and the plaintiff started to develop in late 2007, when Arnold declined the plaintiff's request for a vacation because Arnold was taking one at the same time. Arnold testified that he informed the plaintiff that she could not take a vacation at the same time that he was, and he claimed that, thereafter, the plaintiff's mood began to darken and she became a less pleasant and productive employee. The plaintiff testified that she did not view the denial of her vacation request as a serious problem and that she continued to get along with everyone in the office.

Around the same time, in November 2007, after receiving complaints from citizens, the Wilson County Commission, led by Commission Member Heather Scott, created a study committee to examine the level of service provided by the WCACD. The purpose of the study committee was to investigate procedures at the WCACD and, following investigation, make

[1] The facts, as discussed herein, are largely drawn from the court's memory of and notes from the trial, as confirmed by the facts as discussed in the parties' post-trial briefing.

recommendations to the Wilson County Urban Type Public Facilities Board ("UTPFB"), which supervised Arnold. While the UTPFB oversaw Arnold, there is no dispute that Arnold had full authority and discretion to terminate employees under his supervision.

As the committee was gathering information and holding its initial meetings, the plaintiff, who now had several years of experience with the WCACD, was frequently in contact with Scott and fellow committee member Melissa Richards to discuss problems and concerns that the plaintiff had about the WCACD's policies and compliance with the law, including its failure to properly neuter and vaccinate captured animals.

After the January 2008 meeting of the committee, which among other things considered the problem of overly aggressive dogs running loose, Scott asked committee member (and Arnold's friend) Kenneth Reich to contact Arnold and ask him if Arnold would be willing to give up control of the WCACD, that is, just manage the Solid Waste Division. Reich did so, and Arnold declined to voluntarily give up control of the WCACD (and the additional stipend that came with it).

In early February 2008, Scott toured the WCACD with the plaintiff and Arnold. The plaintiff testified that, around this time, prompted by specific incidents, she had at least two conversations with Arnold as to whether the WCACD was following proper procedures with regard to adoption and vaccination of dogs. The plaintiff testified that she was also very concerned that Dr. Nathan Clariday, a personal friend of Arnold and the contract veterinarian who destroyed dogs for WCACD, was using improper methods, and the plaintiff asked Arnold if she could perform euthanasia for the WCACD, as she was properly trained. The plaintiff testified that Arnold refused this request.

The plaintiff attended the February meeting of the committee and, during the meeting, she was asked by committee members about WCACD policies. During committee meetings and in personal conversations with Scott and Richards, the plaintiff raised concerns that the WCACD was not following state law with regard to vaccinations or the neutering of animals, and she raised concerns about Dr. Clariday as well. There is no dispute that Arnold was aware that the plaintiff was attending the committee meetings. Arnold testified that he had no problem with the plaintiff's attending the committee meetings, and, while he knew that she was attending them, he was not advised what, if anything, the plaintiff was saying about him.

At the committee's invitation, the plaintiff attended the March meeting, where similar issues of effective management and organization were raised, with the committee generally being critical of how Wilson County was maintaining its Animal Control department. Scott testified that, while the committee asked Arnold to give up Animal Control, the committee was not specifically critical of Arnold during these meetings but was critical of Wilson County for giving the WCACD poor guidance.

Reich testified, however, that at least two of the five committee members felt that Arnold was doing a poor job and that there was noticeable "anti-Bill Arnold sentiment" at all of the committee meetings. Moreover, Reich testified that he probably did tell Arnold that there were a significant number of negative things said about him during the committee meetings, although he did not tell Arnold that the plaintiff was saying negative things about him. The consensus of the testimony at trial was that, while the plaintiff raised concerns about the WCACD, she was not openly critical of Arnold during the meetings. The meetings were open and attended by, among others, the mayor and individuals who worked under Arnold's supervision.

The relationship between the plaintiff and Arnold completely deteriorated between February and April 2008. The plaintiff testified that Arnold had fellow employee Paula Heard monitor the plaintiff. Additionally, the plaintiff testified that, during these months, she received constant write-ups, disciplinary notes, and warnings from Arnold, whereas, prior to this, she had not received any discipline in almost four years. The first incident occurred a few days after the February meeting, when, the plaintiff testified, Arnold confronted the plaintiff and chastised her for not having her facts straight before going to the meeting.

The plaintiff testified that from March 3rd through the end of her employment in late April, she received one disciplinary note of some form per day, although the plaintiff's personnel file did not contain nearly this many write-ups. From March 28, 2008 to April 21, 2008, ten notes were placed in the plaintiff's personnel file. (Docket No. 111 at 6.) These notes and warnings focused on the plaintiff's attitude and work performance, including her alleged failure to maintain a proper level of dog food and to maintain proper dispatch logs. The plaintiff also testified that Arnold took additional steps to punish her, such as making her go out on an emergency call at 3 a.m. and restricting the period during which the plaintiff could take her lunch break.

Arnold testified that, during this time period, the plaintiff constantly complained that Arnold's discipline was retaliation for voicing her concerns about how the WCACD was operating. On April 11, 2008, the plaintiff gave Arnold, in response to a letter he gave her on April 9, 2008, a 1½ page note stating her concerns about the way that the office was administered. (Docket No. 16 Ex. 2.) In this note, the plaintiff also claimed that she had been subject to harassment and retaliation due to her involvement with the committee. (*Id.*)

Fellow employee Heather Christian and Heard both testified that they had good working relationships with the plaintiff throughout the plaintiff's employment, but that, on several occasions during this time period, they heard arguing between the plaintiff and Arnold behind closed doors, with the plaintiff occasionally raising her voice at Arnold or storming out of a meeting. Christian testified that the animosity between the plaintiff and Arnold, and, specifically, the plaintiff's yelling and slamming doors, changed the atmosphere of the workplace, creating tension where none existed before. Christian also testified, however, that she was very surprised that the plaintiff eventually lost her job, because no one had ever been fired from the WCACD before, despite the presence of employees who, at times, made significant mistakes.

Following a tense meeting on April 14, 2008, Arnold informed the plaintiff that he was demoting her from Animal Control Supervisor to Animal Control Officer. On April 22, 2008, Arnold terminated the plaintiff's employment. Arnold testified that the precipitating event was a dispute over the proper use of ice cube trays during which the plaintiff "exploded," which, in Arnold's view, was consistent with the hostile and disruptive workplace behavior that the plaintiff had been exhibiting for several months. During his testimony, Arnold admitted that the plaintiff's frequent complaints that Arnold was retaliating against her for raising concerns about the WCACD was part of the reason for his termination of the plaintiff. Arnold went so far as to say that, if the plaintiff had not complained about retaliation, she would not have been terminated, although he later indicated otherwise and also testified that he fired the plaintiff because of her attitude and that he would have taken the same measure even if the plaintiff had never attended a committee meeting or talked to Wilson County officials regarding the WCACD.

Lynch testified that the plaintiff was given no notice of her termination prior to meeting with Arnold, and, at that meeting, she was given a choice of resigning or being fired. The plaintiff refused to sign the resignation letter and, for 10-15 minutes, tearfully begged Arnold not to fire her. The plaintiff cited to Arnold that she was a single mother with health problems and two children at home.

The plaintiff testified that she did not "explode" over the ice cube trays and that, while she certainly got frustrated with Arnold during this period, her discipline and termination were clearly connected to her work with the committee. She also testified that the immediate period following her termination was very difficult. That is, the night that she was terminated, her oldest daughter was admitted to the hospital with a serious neurological problem. The plaintiff testified that she did not find another job until January 2009 and that that job's starting pay was $10,000 less per year and lacked the benefits of the WCACD position, such that she could not obtain follow-up treatment for her daughter's neurological problems. Also, the plaintiff testified that she was mentally and emotionally injured by the termination and by the negative press coverage of her termination, which cited the plaintiff's hostile attitude and insubordination as the bases for her termination.

As indicated above, on August 6, 2010, the jury found for the plaintiff on both of her claims. On the plaintiff's Section 1983 claim, which alleged that the plaintiff had been terminated for exercising her First Amendment rights to speak on matters of public concern, the jury awarded the plaintiff $425,000 – $250,000 from Wilson County and $175,000 from Arnold, $25,000 of which were punitive damages. (Docket No. 86; Docket No. 89.) On the plaintiff's Public Employee Political Freedom Act of 1980 (PEPFA) claim, which alleged that Wilson

County had punished the plaintiff for communicating with elected public officials, the jury awarded the plaintiff $175,000 to be paid by Wilson County. (Docket No. 86.) At the conclusion of the proceedings, plaintiff's counsel requested that the court treble the PEPFA damages pursuant to the plain language of the statute. The court took the issue under advisement and ordered further briefing.

## ANALYSIS

On September 3, 2010, the defendants filed the pending motion seeking judgment as a matter of law under Federal Rule of Civil Procedure 50, or, alternatively, a new trial under Rule 59, or, alternatively, a remittitur. (Docket No. 98.) On September 9, 2010, the plaintiff filed her Motion for Attorneys' Fees, seeking attorney's fees pursuant to the fee-shifting provisions of Section 1983 and PEPFA. (Docket No. 101.) Finally, as noted above, the parties have briefed whether it is appropriate for the court to treble the PEPFA award.

### I. Standard of Review

#### A. Rule 50(b)

A motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) may only be granted where, in viewing the evidence in the light most favorable to the non-moving party, no genuine issue of material fact remains for the jury, and all reasonable minds would necessarily find in favor of the moving party. *Gray v. Toshiba Am. Consumer Prods.*, 263 F.3d 595, 598 (6th Cir. 2001). That is, here, viewing the evidence in the light most favorable to the plaintiff, the defendants must show that the evidence against the plaintiff's position was so overwhelming that no reasonable factfinder could find in the plaintiff's favor. *Patton v. Sears, Roebuck & Co.*, 234 F.3d 1269, 1269 (6th Cir. 2000).

### B. Rule 59(a)

While a new trial can be ordered for a wide variety of reasons, generally, a court may grant a new trial under Fed. R. Civ. P. 59(a) "if the verdict is against the weight of the evidence, if the damages award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party." *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000). The burden of demonstrating the necessity of a new trial is on the moving party, and the ultimate decision whether to grant such relief is a matter vested within the sound discretion of the district court. *Clarksville-Montgomery Co. Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1002 (6th Cir. 1991). In deciding a motion for a new trial based on the proposition that the verdict is against the weight of the evidence, a trial court may compare and weigh the opposing evidence. *Conte*, 215 F.3d at 637. It may not, however, set aside a jury's verdict simply because the court might have reached a different conclusion or might have drawn different inferences; the jury's verdict should be accepted if it "could reasonably have been reached." *Id*.

## II. The Defendants' Argument for Post-Trial Relief

### A. Weight of the Evidence

The defendants' primary argument is that evidence presented at trial did not support a claim of First Amendment retaliation, and, therefore, the jury's verdict in favor of the plaintiff should not be sustained. (Docket No. 98 at 7-11.) As discussed in the June 18, 2010 Memorandum that ruled on the cross motions for summary judgment in this case:

> To establish a First Amendment retaliation claim, the plaintiff has the burden of proof on a three-step inquiry. *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 1998).
>
> First, the court must decide whether the relevant "speech addressed a matter of public concern." *Id*. Speech on a matter of public concern includes "informing the public that a

> governmental entity failed to 'discharge its governmental responsibilities' or 'bringing to light actual or potential wrongdoing or breach of public trust.'" *Id*. (quoting *Connick v. Myers*, 461 U. S. 138, 148 (1983)).
>
> Second, the court must balance the employee's interest, as a citizen, in commenting on matters of public concern against the employer's interest in "promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). That is, the court must determine whether an employee's speech "meaningfully interfere[s] with the performance of her duties, undermine[s] a legitimate goal or mission of the employer, create[s] disharmony among co-workers, impair[s] discipline by superiors, or destroy[s] the relationship of loyalty and trust required of confidential employees." *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994).
>
> Third, the court must determine whether the protected speech was a "substantial or motivating factor" in the employer's decision to terminate the employee. *Perry*, 209 F.3d at 604. This determination is normally a question for the jury, unless the evidence is almost completely one-sided. *See Boger v. Wayne County*, 950 F.2d 316, 322-23 (6th Cir. 1991). This inquiry focuses on whether the employee can "point to specific, nonconclusory allegations reasonably linking her speech to employer discipline." *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 144 (6th Cir. 1997)).
>
> If the plaintiff meets her burden with respect to the three elements, then the burden shifts to the defendant to show that it would have carried out the adverse employment action against the plaintiff, notwithstanding the plaintiff's exercise of protected speech. *Rodgers*, 344 F.3d at 603; *see also Perry*, 209 F.3d at 604, n.4.
>
> (Docket No. 33 at 9-10.)

Here, the defendants maintain that, on the proof presented at trial: (1) the speech at issue concerned "internal working conditions," such as whether Arnold was treating the plaintiff fairly, not matters of public concern; (2) the plaintiff's speech, protected or not, was "disruptive" and "meaningfully interfered" with her performance and the proper functioning of the office; and (3) the speech was not a motivating factor in the termination because the plaintiff had become "extremely difficult to work with and would have been terminated regardless of her protected speech." (Docket No. 98 at 7-11.)

In response, the plaintiff argues that the defendants' reliance on the *prima facie* case is misplaced. (Docket No. 111 at 3.) That is, generally, "when reviewing the facts of a

discrimination claim after there has been a full trial on the merits," the court, while not ignoring the elements of the *prima facie* case, is to examine the "ultimate question," here, retaliation, rather than exploring the individual elements of the *prima facie* case. (*Id.* citing *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2001)); *see also Lentz v. City of Cleveland*, 333 Fed. Appx. 42, 45-48 (6th Cir. 2009). The plaintiff goes on to argue (presenting much of the evidence discussed above) that she presented "overwhelming evidence" of impermissible retaliation. (Docket No. 111 at 3-9.)

Here, considering the "ultimate question" of retaliation and (the elements of the *prima facie* case that inform the ultimate question), the jury reasonably could have found the defendants improperly retaliated against the plaintiff for the plaintiff's exercise of her First Amendment rights. First, the jury could have easily recognized that the plaintiff, until late 2007, was a well-respected employee who had had virtually no problems with Arnold and was progressing smoothly through a governmental entity that did not extensively discipline or sanction its employees.

The evidence showed that the special study committee presented problems for Arnold because it investigated citizen complaints about the WCACD, and, indeed, after only two meetings, the committee asked Arnold if he would consider ceding control of the WCACD. It was clear to Arnold that the plaintiff was participating in the committee meetings, and, while those meetings may not have been overtly critical of Arnold, they were not supportive of him either.

It was in this context that, for the first time, the plaintiff began receiving notes and warnings about her workplace performance, and, particularly in an environment where such

discipline was rare and the working relationship had previously been good, the jury could have reasonably concluded that the plaintiff was singled out by Arnold because she was raising concerns to the study committee about procedures at WCACD. The jury heard Arnold's admission that he fired the plaintiff, in part, because she was complaining about retaliation, and, on balance, the jury could have readily concluded that Arnold viewed the plaintiff and her complaints about following appropriate procedures as a "thorn in his side" that Arnold first tried to control with thinly veiled disciplinary notes and, finally, when that failed to quiet the plaintiff, termination.

Of course, the evidence was not completely one-sided. Both Arnold and Lynch testified that the animosity between Arnold and the plaintiff had its genesis in the dispute over vacation scheduling, and Arnold and others testified that the plaintiff had moments, particularly toward the end, in which she was a disruptive presence in the office. That said, it was not difficult or unreasonable for the jury to draw a clear line of causation from the plaintiff's clearly protected speech on animal control policies and procedure at the WCACD to Arnold's new-found disciplinary streak to the plaintiff's eventual termination. Therefore, the jury's verdict on the Section 1983 claim could reasonably have been reached and will not be disturbed.[2]

---

[2] The defendants focus this section of their briefing on the plaintiff's Section 1983 claim, but they incorporate the same argument in support of the proposition that the plaintiff's PEPFA claim also was not supported by the evidence. (Docket No. 98 at 11.) Again, PEPFA sanctions a public employer for punishing an employee for communicating with elected public officials. T.C.A. § 8-50-603(a). The defendants argue that "the plaintiff failed to establish by a preponderance of the evidence at trial that any discussions she had with any Wilson County elected official was a substantial or motivating factor in her termination." (Docket No. 98 at 11.) For the same reasons discussed above, a reasonable jury could have found for the plaintiff on the PEPFA claim because the jury could have drawn an unbroken chain of causation between the plaintiff's conversations with Wilson County commissioners (both at meetings and privately) regarding WCACD policies and Arnold's decision to remove the plaintiff from her position.

### B. Punitive Damages

Next, the defendants argue that the plaintiff did not demonstrate that Arnold displayed an "evil motive or intent" or the "reckless or callous disregard" for the plaintiff's constitutional rights that is required to award punitive damages against Arnold under Section 1983. (Docket No. 98 at 11-12 citing *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Again, the defendants argue that Arnold was not concerned that the plaintiff was attending the committee meetings and that the plaintiff was terminated for her hostile attitude. (*Id.*) The defendants argue that the only (improper) basis that the jury could have had for awarding punitive damages in this case was "to punish [Arnold] for [] alleged violations of the law," concerning care and treatment of animals, which is unrelated to the claims in this case and, in any event, is an improper basis for awarding punitive damages, given that Arnold had no control over the scope of services provided by the WCACD. (*Id.* at 13.)

In response, without providing any authority, the plaintiff argues that, by not objecting to the jury charge, the defendants waived the right to challenge the award of punitive damages here. (Docket No. 111 at 9.) Moreover, the plaintiff argues, "the evidence at trial decisively showed that Defendants recklessly and callously disregarded" the plaintiff's rights and "intentionally and maliciously disciplined, harassed, tormented, demoted, and discharged her for engaging in protected speech activity." (*Id.*)

The court can detect no basis for overturning the punitive damages award. Again, the jury could have reasonably found that Arnold intentionally retaliated against the plaintiff for attempting to improve the services at the WCACD, and, in so finding, the jury could have concluded that Arnold's interests in doing so were, primarily, protecting his own job security and

comfort (and that of his friends, such as Dr. Clariday). In light of this, the jury could have reasonably found that Arnold's "papering" of the plaintiff's personnel file and the eventual termination of the plaintiff amounted to conduct that, at least, recklessly and callously disregarded the plaintiff's rights, because it elevated Arnold's personal interests over the plaintiff's, let alone the public's interest in having an effectively run animal control department. Moreover, particularly in light of the lack of discipline at the WCACD heretofore, the jury could have concluded that Arnold's refusal to reconsider his decision when the plaintiff repeatedly and tearfully begged for her job back, citing the fact that she was a single mother caring for two children with significant medical costs, further justified the award of punitive damages. Again, the court detects no basis to adjust the relatively minor punitive damage award in this case.

**C. Compensatory Damages**

As noted above, the defendants seek a new trial or remittitur of the compensatory damages award. (Docket No. 98 at 13.) Such a motion should be granted only if the award "clearly exceeds" the amount which, under the evidence in the case, was the maximum that a jury could have reasonably awarded. *Fischer v. United Parcel Serv., Inc.*, 2010 WL 2994002, *6 (6th Cir. July 27, 2010). "To qualify for reduction, the award must be (1) beyond the range supportable by proof; (2) so excessive as to shock the conscience of the court; or (3) the result of a mistake." *Id.*

The defendant claims that the compensatory award here is "patently excessive." (Docket No. 98 at 14.) That is, the plaintiff was out of work only eight months and obtained a new job that, while paying her somewhat less, still provided a reasonable living. (*Id.*) Moreover, any lost benefits from the WCACD are speculative and cannot justify such a large award. (*Id.*)

Additionally, the plaintiff introduced no demonstrative proof of mental distress. (*Id.* at 15.) The defendants also point to the 2009 *Lentz* case. In *Lentz*, the plaintiff endured a 22-month workplace re-assignment that he alleged was racially motivated and caused him significant anger and isolation. 333 Fed. Appx. at 50. The Sixth Circuit found that an $800,000 compensatory award (of which about $708,000 was to compensate for emotional harm) was excessive and that it was an abuse of discretion for the district court not to order a remittitur. *Id.* The court noted that the emotional harm, while real, was temporary, particularly given that the plaintiff was able to return to his normal job after the re-assignment. *Id.* The Sixth Circuit remanded, suggesting that a $150,000 award would be more appropriate. *Id.*

In response, the plaintiff points to the more recent *Fischer* case, in which the Sixth Circuit upheld a $650,000 compensatory award in a retaliatory discharge action in which the damages were based almost entirely on emotional harm. 2010 WL 2994002, *6-7. There, the court noted that, while the plaintiff had not provided any medical evidence to support his claims of emotional harm, he had compellingly testified to the disruption that the termination in employment had caused his professional and personal life, including being out of work for a year and breaking up his family. *Id.* The court recognized that compensatory awards in seemingly similar cases are "widely varied" and noted the difficulty of attempting to reconcile those awards, especially on the appellate level. *Id.* The court "decline[d] the invitation" by the defendant to disturb the compensatory award in *Fischer*. *Id.*

Likewise, while the compensatory damage award here is substantial, the court can find no legitimate basis to disturb it. The jury heard that the plaintiff was on a path to success at the WCACD; she was well liked and received a promotion to supervisor. She was also well liked by

members of the Wilson County Commission. Then, she attempted to improve the performance of the WCACD and, the jury concluded, was fired as a result, but only after enduring two and one-half months of unjustified discipline from Arnold. At the same time, the plaintiff was also attempting to raise two children, as a single mother, responsible for the costs of her medical care and the medical care of her children. The defendants knew of these difficulties and fired her anyway. Compounding all of this, the plaintiff was subjected to newspaper articles that indicated that she had been fired for insubordination and a poor attitude and, on the night of her termination, one of her children was taken to the emergency room with neurological symptoms that have not yet been finally diagnosed as related to a brain tumor or muscular sclerosis.

In light of this, medical evidence is not required to see that the emotional harm suffered by the plaintiff would be profound. The plaintiff searched for months for another job, only to find one that paid less and did not offer the benefits or upward mobility of her previous position. Obviously, awarding compensatory damages is not an exact science, and each case must be judged on its own facts, but, in light of the Sixth Circuit's more recent ruling in *Fischer* and the clear distinctions from *Lentz* (for instance, the plaintiff there was not terminated), the court cannot say that the jury's $600,000 compensatory award "clearly exceeds" the maximum amount that the jury could find.[3] The court will not disturb the award.

**D. PEPFA/Election of Remedies**

---

[3]Additionally, unlike in *Fischer*, a considerable portion of this award is not tied to emotional harm. As the plaintiff points out, the jury heard that the plaintiff had "over $32,000 in back pay" and lost a "substantial amount in both employment and Tennessee Consolidated Retirement System benefits." Moreover, the jury was instructed to award the plaintiff damages that "she was reasonably certain to sustain in the future," which certainly could have included the income disparity between her upwardly mobile WCACD position and future employment. (Docket No. 96 at 7.)

As noted above, at the end of the trial, plaintiff's counsel asked the court to treble the $175,000 PEPFA award pursuant to the plain language of the statute. Specifically, the statute states: "if the court of competent jurisdiction determines that a public employer has disciplined, threatened to discipline or otherwise discriminated against an employee because such employee exercised the rights provided by this part [that is, to communicate with an elected public official], such employee shall be entitled to treble damages plus reasonable attorneys' fees." T.C.A. § 8-50-603(b). The court directed the parties to brief whether the court had any discretion in this area.

In her brief, the plaintiff argues that "there is no room for interpretation. The entitlement to treble damages is cast in mandatory rather than permissive terms. Therefore, the Court should treble the damages that the jury awarded Plaintiff under the PEPFA." (Docket No. 88 at 1.) The plaintiff goes on to cite ample authority for the proposition that, when the legislature uses the term "shall" in a statute, it should be considered to impose a mandatory obligation. (*Id.* at 2 citing *e.g. Home Builders Ass'n. of Middle Tenn. v. Williamson County*, 304 S.W. 3d 812, 818 (Tenn. 2010)).

The plaintiff also points to one of the few cases interpreting PEPFA, *Pewitt v. Buford*, 1995 WL 614327 (Tenn. Ct. App. Oct. 20, 1995), in which, applying basic rules of statutory construction, the court found that this provision was designed by the legislature not to punish but "to insure free and uninhibited communication between persons employed in government and their respective elected officials. Obviously, the Legislature recognized that such communication can inure to the public good and assist in operating economical and efficient

public offices."[4] *Id.* at *5-7. Therefore, the treble damages provision operates, unlike a punitive damage clause, "under a very narrow set of circumstances," to encourage open communication by imposing increased costs on the public employer that discourages unfettered communication. *Id.*

In response and in their motion for post-trial relief, the defendants do not challenge that the provision clearly mandates the award of treble damages. Rather, the defendants primarily argue that the plaintiff must make an "election of remedies" between her Section 1983 damages and her PEPFA damages because, otherwise, the plaintiff would obtain an impermissible "double recovery for the same injury." (Docket No. 93 at 1-3 citing *General Tel. Co. v. EEOC*, 446 U.S. 318, 333 (1980)). That is, the defendants claim, the plaintiff, under two statutes, alleged that she was terminated for speaking out to elected officials, and the jury awarded her damages under each provision, resulting in a double recovery for a single injury. (*Id.*) The defendants argue that the plaintiff should be required to choose which statute she wants to recover under, but that she cannot be allowed to recover under both. (*Id.* citing *Farris v. Standard Fire Ins. Co.*, 280 Fed Appx. 486, 489 (6th Cir. 2008)).

The defendants' election of remedies argument is without merit. The Sixth Circuit has concluded that, where, as here, the defendant does not object to jury instructions and a verdict form that allows the jury to allocate total damages across various causes of action, it should be presumed that the jury determined the total value of the plaintiff's injury and then allocated that

---

[4]*Pewitt* also determined that, even if the trebling damages provision was punitive in nature, it was still permissible to impose punitive damages against the public entity, because such damages were "expressly authorized by statute." *Id.* at n.6 (quoting *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 261 n. 21 (1981)).

total amount across the claims. *Johnson v. Howard*, 24 Fed. Appx. 480, 485-86 (6th Cir. 2001)(citing *Gentile v. County of Suffolk*, 926 F.2d 142, 153-54 (2nd Cir. 1991)). Indeed, in *Johnson*, the court presumed that the jury had allocated damages across claims, even though the jury had awarded the plaintiff the exact same amount for his Section 1983 claim and his state law battery claim. *Id.* Moreover, in *Farris*, which is relied upon by the defendants, the Sixth Circuit concluded that it was *improper* to invoke the election of remedies doctrine where the jury awarded the plaintiff differing amounts on his breach of contract and consumer protection act claims, and the court recognized that the jury may have simply allocated the total damages across two claims. 280 Fed. Appx. at 489.

Here, there is no reason not to presume that the jury simply determined the plaintiff's total damages and allocated those damages across the parties and claims. The jury instructions and verdict form, which mirrored the proposed jury instructions and verdict form submitted by the defendants, instructed the jury to determine the plaintiff's actual damages and to determine the liability of each defendant for each claim. (Docket Nos. 71-72; Docket No. 83 at 24; Docket No. 86.) In this context, it is hard to see how the jury could have awarded the plaintiff a double recovery; rather, the jury verdict only provided an opportunity for the jury to allocate its damages across parties and claims. (Docket No. 86.) This point is supported by the fact that the jury awarded differing amounts as against each defendant under each claim. (*Id.*) This strongly suggests that the jury determined the plaintiff's total damages and then apportioned those damages to reflect its findings as to each defendant's liability in light of the specific, and slightly differing, dictates of each statute. In light of all of this, the defendants' election of remedies argument is without merit.

In their briefing, the defendants make a series of other arguments in an effort to avoid the trebling of damages. First, the defendants argue that, *if* the court finds the PEPFA provision to be punitive, it cannot treble damages without the jury's first finding "clear and convincing" evidence of a statutory violation, as is required, absent statutory language, to impose punitive damages under Tennessee law (the jury, without objection from the defendants, received a preponderance of the evidence instruction). (Docket No. 93 at 4 citing *Buddy Lee Attractions v. William Morris Agency, Inc.*, 13 S.W.3d 343, 354 (Tenn. Ct. App. 1999)). Again, the Tennessee appellate court in *Pewitt* strongly indicated that PEPFA is not punitive but exists as a device to encourage free and open communication with elected officials. *See also Cook County v. Chandler,* 538 U.S. 119, 130 (2003)(statutory provisions that treble damages often contain a significant "compensatory side" or are driven by motivations aside from punishment). As the statute has not been found to be clearly punitive, this argument is without merit.

Next, the defendants argue that, if the PEPFA award is trebled, Wilson County "is entitled to an offset for the amount of compensatory damages." (Docket No. 93 at 5.) The defendants rely on *Reinhart v. Knight*, 2005 Tenn. App. Lexis 753 (Tenn. Ct. App. Dec. 2, 2005). In that case, the plaintiff sued two sets of defendants in relation to a real estate contract, one for breach of contract and one for statutory procurement of breach of contract, for which the statute permitted trebling of damages. *Id.* at *2. The jury was instructed simply to find "the total amount of damages arising from this breach of contract," and, in light of that, entered identical damage awards against each set of defendants, and the court trebled the amount of statutory damages. *Id.* at *2, 18.

The court found that the defendants who owed the larger statutory award were entitled

to a credit of the amount paid by the "breach of contract" defendants, given that the trebled award included a "compensatory element," and the jury had clearly awarded the same damages against both defendants, raising the prospect of a double recovery. *Id.* The court noted that "a special jury verdict form should [have] be[en] used, breaking down and itemizing the classes of compensatory damages, in order to clarify and avoid confusion." *Id.* at *18.

*Reinhart* is of little assistance to the defendants here. Not only are the unique factual circumstances in that case readily distinguishable, but, as discussed above, there is no prospect of a "double recovery" here.[5] Using a "special verdict form" of the type discussed in *Reinhart*, the jury allocated its total assessed damages and found that $175,000 of those damages or, about 30 percent, were attributable to Wilson County for punishing the plaintiff for speaking to elected officials. In light of that finding, the statute offers no alternative – the court must treble the damages, and, therefore, the court will increase Wilson County's PEPFA liability from $175,000 to $525,000.[6]

---

[5]The defendants, in a footnote, point to *Mitchell v. Ridgetop*, Case No. 3:01-CV-1503 (M.D. Tenn.), as a case in which this court trebled PEPFA damages, and, "upon information and belief," the plaintiff made an election of remedies between her Section 1983 damages and her PEPFA damages. (Docket No. 93 at 3.) The defendants maintain that "the pleadings from that case are not available on CM/ECF and the Defendant has been unable to obtain a copy of the Judgment from the Federal Record Center in Atlanta before filing this response." (*Id.*) That case was tried by Judge Trauger, and it may well be the case that plaintiff's counsel agreed with a defense assertion that the plaintiff needed to make an election. The record does not indicate that the court ruled on this as a contested issue, so, even if an election was made, this case is hardly authority for the fact than election must be made.

[6]Significantly increasing the award under PEPFA does not change the court's conclusion that the total compensatory award in this case should not be reduced. PEPFA plainly envisions a situation in which the jury would determine the amount of damages owed under PEPFA and then the court, in recognition of the important interests protected by PEPFA, would triple the award. The court would not be serving the statute's purpose if it declined to treble the award out of concern that the total compensatory award would be too high – PEPFA is clearly supposed to

### E. Conclusion on Defendants' Post-Trial Motions and Briefing

The jury's verdict in this case reasonably could have been reached, and the damage awards assessed by the jury, while substantial, do not "clearly exceed" what is appropriate under the circumstances. Moreover, the defendants have failed to provide authority that the court has discretion in terms of trebling the PEPFA award, and the myriad of arguments advanced by the defendants to avoid trebling are not persuasive. Therefore, the court will not disturb the $250,000 award against Wilson County and $175,000 award against Arnold under Section 1983 and will increase the $175,000 PEPFA award against Wilson County to $525,000, for a total award of $775,000 against the County and $175,000 against Arnold.[7]

## III. Attorney's Fees

---

result in very significant awards where the public entity's misconduct has resulted in significant damages.

[7]The defendants also argued that they are entitled to a new trial because the court erred in "granting the Plaintiff's Motion in Limine to exclude evidence of prior claims." (Docket No. 98 at 18.) The defendants, in purely conclusory fashion, claim that the fact that the plaintiff asserted claims (including sexual harassment) in this litigation that she later dismissed is "relevant and should have been made known to the jury," because it weighed on the plaintiff's credibility. (*Id.*) It is well settled that a plaintiff, acting in good faith, is permitted to plead, at the outset, multiple and even alternative claims and to allow the discovery process to sort out which claims, if any, have merit. *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 805 (1999). Given that there is no evidence that these other claims were asserted in bad faith, it was not an error to exclude evidence of these prior claims. The fact that the plaintiff permissibly asserted these claims has no clear impact on her credibility, and this evidence would have distracted the jury from the task at hand – that is, to determine whether the plaintiff was fired for her speech. *See Bryce v. Trace, Inc.*, 2008 WL 906142, *3 (W.D. Okla. March 31, 2008)(granting the plaintiff's motion *in limine* to exclude reference to abandoned and dismissed claims as it is "common practice" to "shield[]" the jury from "such matters"); *L'Etoile v. New England Finish Sys., Inc.*, 575 F. Supp.2d 331, 340 (D.N.H. 2008)(finding evidence that the plaintiff had voluntarily dismissed claims earlier in the same litigation had "little if any probative value on the issue of [the plaintiff's] credibility, but carries significant risk of undue delay and waste of time.")

Neither party disputes that, under the plain language of 42 U.S.C. § 1988 and T.C.A. § 8-50-603(b), the plaintiff is entitled to attorney's fees in this case. The plaintiff requests $170,246.70 in total fees, that is, $145,990 for the work performed by lead counsel Douglas B. Janney and $24,256.70 for the work performed by assistant trial counsel Jerry Gonzalez. (Docket No. 101 at 1.)

The party seeking an attorney's fee award pursuant to a statute has two main obligations: (1) to provide the court with "evidence supporting the hours worked and rates claimed" and (2) to demonstrate that the requested fee award is "reasonable." *Building Service Local 47 v. Grandview Raceway*, 46 F.3d 1392, 1402 (6th Cir. 1995); *U.S. Structures v. J.P. Structures*, 130 F.3d 1185, 1193 (6th Cir. 1997). Here, the plaintiff has provided time records and task descriptions for both Janney and Gonzalez which document, day-by-day for the course of this litigation, the task performed and the time spent thereon. (Docket Nos. 104-105.) The plaintiff has clearly provided the court with "evidence supporting the hours worked and rates claimed." The remaining question is whether, in light of all of the circumstances of this case, the fee award sought is "reasonable."

The starting point for determining the reasonableness of a requested fee is the "lodestar" analysis, whereby the requested fee is compared with the amount generated by multiplying the number of hours reasonably worked on the litigation by the reasonable hourly rate. *U.S. Structures*, 130 F.3d at 1193. A reasonable hourly rate is determined by considering the skill, experience, and reputation of the attorneys involved and the market in which they practice. *Adcock-Ladd v. Secretary of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000). If the requested fee is essentially in line with the "lodestar," then there is a strong presumption that the requested fee is

reasonable and recoverable. *Id.*

In addition to the lodestar analysis, the court should also consider any relevant "*Johnson*" factors and whether some adjustment to the award is required under those factors. *See Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999)(*citing Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)). These factors are: (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* The Sixth Circuit has recognized that, often, these factors are naturally blended into the reasonableness analysis. *Paschal v. Flagstar Bank*, 297 F.3d 431, 435 (6th Cir. 2002).

The plaintiff requests that Janney be compensated at $325 per hour and Gonzalez at $397 per hour. (Docket No. 102 at 4.) The plaintiff provides affidavits from Janney and Gonzalez. Janney asserts that he has more than a decade of experience specializing in employment litigation and has managed his own practice since 2004. (Docket No. 104 at 1-2.) Janney states that, as here, most of his work is performed on a contingency fee basis, but, when he does not charge on that basis, he charges between $200 and $325 per hour. (*Id.*) Janney maintains that compensation at the higher end of that range is appropriate here, given the personal financial risk of representing individuals who cannot pay a standard hourly fee and the significant work involved in prosecuting an employment discrimination case. (*Id.* at 3.)

Gonzalez asserts that he concentrates in employment litigation and agreed to be co-counsel "only for statutory attorney fees that the court may award," that is, he incurred significant risk that his efforts at trial would not be compensated. (Docket No. 105 at 3.) Gonzalez also states that, in a previous case, Wilson County agreed to settle a claim with his client and pay him $397 per hour for his work as plaintiff's counsel. (*Id.* at 5.) Gonzalez goes on to claim that his work at trial was particularly valuable, as he was able to quickly contrast deposition testimony with trial testimony using his specialized technical expertise, and, using his knowledge of Wilson County government, he was able to quickly locate key documents, including the evidence that Arnold received a separate stipend for his work at the WCACD. (*Id.* at 6-7.)

Three Nashville-based attorneys, Charles Yezbak, Wade Cowan, and Stephen Grace, who specialize in employment litigation, submitted affidavits that assert that Janney's requested hourly rate is entirely reasonable. They cite: Janney's considerable talents as an attorney, the (often higher) rates charged by similar attorneys in this market, the risks associated with trying such a case (including the risk of receiving no recovery), and the difficulty of marshaling the facts and evidence. (Docket No. 106-108.) While suggesting that their work requires significantly more personal financial risk than that of defense counsel, plaintiff's counsel also provides evidence that their requested compensation would be below the median billing rate of a partner at a large Nashville law firm such as Bass Berry & Sims, which, in 2008, was $420 per hour. (*See* Docket No. 102 at 4.)

The plaintiff also maintains that counsel spent a reasonable number of hours on this litigation. (*Id.* at 5.) That is, Janney, as plaintiff's lone counsel for much of this litigation, spent

449.2 hours on this case and Gonzalez, who began working just before the trial, spent 61.1 hours. (*Id.*) Again, the plaintiff submits affidavit testimony from the lawyers mentioned above stating that these hours are reasonable, and the case certainly required significant work, in terms of discovery, cross motions for summary judgment, a trial, and post-trial briefing. The plaintiff, therefore, argues that counsel's hours spent and billing rates are reasonable, and the amount requested ($170,246.70 = 449.2 X 325 + 61.1 X 397) is an appropriate lodestar. (*Id.* at 6.) The plaintiff also argues that there is no reason for any downward adjustment from the lodestar. (*Id.* at 6-9.)

In response, the defendants argue that the plaintiff's requested fee should be reduced because she initially asserted several claims (including Equal Pay Act and FLSA claims) that she later abandoned. (Docket No. 117 at 2.) The plaintiff asserted these claims from the filing of the Complaint on March 17, 2009 to their voluntary dismissal on April 15, 2010, prior to summary judgment briefing. (*See id.* at 3.) The defendants note that, for most of Janney's time entries during this time period, it is not possible to determine the "time spent on the successful claims from the time spent" on claims that were later abandoned. (*Id.*) The defendants request that Janney's fee for this time period be reduced by 50 percent to prevent compensation for unsuccessful claims, which would reduce his fee by about $20,000. (*Id.*)

An attorney is not entitled to recover for a claim that is unsuccessful and "distinctly different" in terms of facts and legal theory from a successful, compensable claim. *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). However, the Sixth Circuit has recognized that "litigation is not an exact science" and that "good lawyering . . . often requires lawyers to plead in the alternative" and, therefore, "when claims are based on a common core of facts *or* are based

on related legal theories, for the purpose of calculating attorney fees they should not be treated as distinct claims, and the cost of litigating related claims should not be reduced." *Jordan v. City of Cleveland*, 464 F.3d 584, 604 (6th Cir. 2006)(emphasis added)(internal quotation omitted).

That is, "full credit" should be given to a "meaningfully successful plaintiff rather than making a mechanical per-losing-claim deduction" in the award. *Id.* A basic review of the plaintiff's Complaint demonstrates that all of the plaintiff's claims were based on the circumstances of her employment and termination from the WCACD and, therefore, the claims were all based on a common core of facts. In light of *Jordan*, the defendants' argument is without merit.

The defendants also object to some of the individual time entries. (Docket No. 117 at 3.) The defendants maintain that the plaintiff's counsel should not be able to recover for a combined 27.4 hours of time counsel spent "reviewing and summarizing depositions," "preparing exhibits for trial," and driving to obtain a copy of a judgment, because these tasks do not require a lawyer. (*Id.* at 4.) Moreover, the defendants claim that Janney could not, as he claimed, have spent 35 of the 48 hours on August 4 and 5, 2010 at trial or preparing for trial, and that a few other entries (totaling about 5.5 hours of time) appear excessive. (*Id.* at 5.) The defendants provide no evidentiary support that Janney did not work the hours he claims or provide anything more than conclusory statements that the time appears "excessive" or that the work at issue should not have been done by a lawyer. Inconsistent with the tenor of *Jordan*, the defendants are nit-picking here and doing so based upon speculation. To the court, a combined 510 hours over roughly 16 months to prosecute a fact-intensive case from the filing of the Complaint, through discovery and cross motions for summary judgment, a trial and post-trial briefing is entirely

reasonable.

Finally, the defendants argue that the requested rates are excessive because lower rates have been approved for plaintiff's counsel in other civil rights cases in this District (Janney received $275 per hour in a case in June 2009), and they claim that they could not locate a civil rights case in which counsel received an award based on a rate as high as Gonzalez is requesting. (Docket No. 117 at 6.) In her reply, the plaintiff points to *Crawford v. Metro Gov't of Nashville and Davidson County*, Case No. 3:03-996, in which, on April 9, 2010, Chief Judge Campbell awarded $500 and $400 per hour to plaintiff's counsel in a Title VII case. (Docket No. 119 at 4.)

Most of the cases relied upon by the defendants are at least two years old, and, clearly, rates increase over time. The defendants certainly have not come forward with an affidavit from Nashville-based counsel indicating that $325 per hour for lead counsel and $397 per hour for specialized trial counsel is unreasonable in a civil rights case tried in Nashville, Tennessee. Moreover, given the risk and difficulty associated with bringing such a claim and the rates charged by defense counsel for work on the other side, the court can detect nothing unreasonable about the rates requested here. Therefore, the court will award the plaintiff the full amount requested as an attorney's fee.

## CONCLUSION

For the reasons discussed herein, the court will deny the defendants' motion for post-trial relief, treble the PEPFA damages, and award the plaintiff the full amount requested in attorney's fees.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge